**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LEVEL THE PLAYING FIELD
P.O. Box 25554
Alexandria, VA 22313

PETER ACKERMAN
1775 Pennsylvania Avenue, NW
Suite 1200
Washington, DC 20006

GREEN PARTY OF THE UNITED STATES
6411 Orchard Avenue
Suite 101
Takoma Park, MD 20912

LIBERTARIAN NATIONAL COMMITTEE,
    INC.
1444 Duke Street
Alexandria, VA 22314

                                  Plaintiffs,

          v.

FEDERAL ELECTION COMMISSION
999 E Street, NW
Washington, DC 20463

                                  Defendant.

Civil Action No.: _____

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Level the Playing Field, Dr. Peter Ackerman, Green Party of the United States
and Libertarian National Committee, Inc. ("Plaintiffs") bring this action for declaratory and
injunctive relief and allege as follows:

## PRELIMINARY STATEMENT

1.      The level of discontent among U.S. voters is higher than at any time since World War II.  In overwhelming numbers, the American people blame the two-party system for the failure of the government to address the problems facing our nation.  A staggering 66% of Americans do not think the federal government has the consent of the governed.  American voters want greater choice and more competition in politics; 53% are unsatisfied with the two party system, and 58% believe a third party is needed.  Record numbers of Americans – well over 40% – now identify themselves as independent, and 62% say they would vote for an independent candidate for president in 2016.

2.      Yet it is unlikely that the American people will ever have a chance to elect the independent candidate that they would prefer because the political system is rigged to favor Democrats and Republicans.[1]  The two major parties have created a series of anti-democratic rules that prevent Americans from learning about candidates that they might prefer to the candidates of the two major parties.  Those numerous anti-competitive measures include gerrymandered districts that protect incumbents; laws that make independent candidacies harder to mount, such as "sore loser" laws that prohibit losing primary candidates from running in general elections; and campaign finance rules that allow Democratic and Republican candidates to raise up to $834,000 per year more from individual donors than unaffiliated candidates can legally raise.  And these are just a few examples of the ways in which the two major parties have abused their power as a duopoly to create rules that entrench themselves and prevent Americans from electing the leaders they prefer.

---

[1] Throughout this Complaint, the term "independent candidate" refers to candidates who are unaffiliated with any political party as well as candidates who are affiliated with political parties other than the Democratic and Republican parties, including but not limited to the Green Party of the United States and the United States Libertarian Party.

3.     This case concerns violations of federal law by two institutions the Democratic and Republican parties have used to perpetuate their duopoly:  the Commission on Presidential Debates ("CPD"), an organization the two parties created for the express purpose of keeping third-party and independent candidates out of debates, and the Federal Election Commission ("FEC"), a "bipartisan" agency run by members of the two major parties, which refuses to carry out its statutory mandate to enforce the federal election laws that the CPD is blatantly violating.

4.     It is obvious that no one can be elected President without participating in the general election debates.  Yet the CPD has rigged the rules governing who can be in the debates to ensure that no candidate other than the Democratic and Republican nominees will ever be invited to the debates.  As Plaintiffs demonstrated in an administrative complaint submitted to the FEC nine months ago, the CPD and its debate rules violate the FEC's regulations and the Federal Election Campaign Act ("FECA") in multiple ways:

5.     *First*, FEC regulations require debate-sponsoring organizations like the CPD to be "nonpartisan."  But since its inception, the CPD has been *bipartisan*, not nonpartisan.  Leaders of the two major parties founded the CPD to create "a permanent framework on which all future presidential debates *between the nominees of the two political parties will be based.*"  The CPD is run by longtime Democratic and Republican insiders, and individuals who have donated tens of thousands dollars, and in some cases even more, to candidates from those parties.  And the CPD's funding comes from large multinational corporations that spend millions and millions of dollars every year to support and lobby Democratic and Republican candidates and officeholders.

6.     *Second*, FEC regulations require the CPD to use "objective criteria" to select debate participants, and prohibit it from using nomination by a particular political party to decide

who may be invited to debate.  Yet for at least the past four presidential elections, the CPD has employed selection criteria that are specifically designed to include the Democratic and Republican nominees, and to exclude independent and third-party candidates from the debates. The principal architect of these exclusionary rules is CPD co-chairman and co-founder Frank Fahrenkopf, Jr., the former Republican National Committee chairman, who refers to the CPD as "my commission"[2] and describes himself as "the Wizard of Oz" for his "behind the scenes" manipulation of our political system.[3]  Just last month, he freely admitted that the CPD's "system" for selecting candidates consists of "go[ing] with the two leading candidates . . . the two political party candidates."[4]  That "system" is hardly the "objective criteria" required by law.

7.    In their administrative complaint, Plaintiffs presented new empirical analysis by prominent experts in statistics, public opinion, and political strategy showing that the CPD's key criterion – requiring a candidate to poll at 15% in an average of five national polls taken in mid-September – is biased against independent and third-party candidates.  This analysis convincingly shows that it is impossible, as a practical matter, for any candidate who does not run in the Democratic or Republican primaries to satisfy the CPD's 15% rule.  Among other obstacles, for example, it would cost nearly $270 million for an independent candidate to achieve the 60-80% national name recognition necessary to satisfy this polling requirement.  The data also demonstrate that polling – which is often highly misleading, as recent U.S. and British elections confirm – is subject to heightened inaccuracy that can severely underrepresent the support for non-major-party candidates in three-way races.  In its public response to Plaintiffs'

---

[2] Interview with Frank Fahrenkopf (Sky News broadcast Apr. 1, 2015), *available at* http://mms.tveyes.com/PlaybackPortal.aspx?SavedEditID=2313770f-b3ce-427a-921f-1f049dde04eb.

[3] Roland Flamini, *Frank Fahrenkopf Sides with Bipartisanship*, Capitol File, http://capitolfile-magazine.com/personalities/articles/frank-fahrenkopf-bipartisanship (last visited June 16, 2015).

[4] Fahrenkopf Interview, *supra note* 2.

evidence, moreover, the CPD did not even attempt to question the data or the experts' methodology, offering instead only conclusory, self-serving, and utterly unconvincing assertions of objectivity unsupported by any empirical data.

8.      *Third*, the CPD's use of millions of dollars of corporate money to provide free televised campaign appearances to the Democratic and Republican presidential and vice presidential candidates violates FECA – by making illegal corporate contributions to political candidates; by making illegal corporate campaign expenditures; by accepting illegal corporate campaign contributions; and by failing to disclose its contributions and expenditures.

9.      The FEC has had Plaintiffs' administrative complaint for over nine months (284 days), and yet has taken no action on it even though FECA requires the agency to act within 120 days.  The FEC has also effectively pocket-vetoed a separate, but related, petition for rulemaking requesting that it amend its debate regulation to prohibit the use of polling as the sole means of access to presidential debates.  The FEC is apparently ignoring the petition for rulemaking even though it too was filed more than nine months ago; even though 1,251 independent individuals and organizations – all but four of whom were unknown to Plaintiffs – filed comments supporting a rulemaking; and even though the only commenter opposing the proposed rulemaking was the CPD itself.

10.     The FEC's failure to act in the face of extensive, convincing evidence that the CPD has violated the election laws is disturbing but not surprising.  Nor is it surprising that the FEC is refusing to open a rulemaking despite overwhelming support for amending the regulation to ensure that presidential debates are more open, representative, and inclusive.  The FEC itself is neither nonpartisan nor independent, and in this context, should not be entitled to any deference whatsoever.  Like the CPD, it is a captive of the two parties:  three of the FEC's six

Commissioners are Democrats, and the other three are Republicans.  A 3-3 split along party lines among the Commissioners has long prevented the FEC from taking action on complaints lodged against major party candidates and political groups aligned with those parties[5] – indeed, the FEC's current chair acknowledges publicly that the agency is "worse than dysfunctional."[6]  But apparently the only thing the bipartisan Commissioners can unanimously agree on today is that the electoral system, including the debate rules, should be rigged to exclude independents and third parties from competing in a fair fight against the major parties.  Indeed, before the CPD adopted its current rules, the FEC rejected its own general counsel's recommendation that the CPD should be investigated for violating the debate regulation.[7]

11.    Even if the FEC were not complicit in the CPD's illegal actions to perpetuate the duopoly, which it clearly is, the agency would be incapable of acting on the administrative complaint, because it has had no general counsel or acting general counsel for 23 months.

12.    The FEC's intransigence will enable the CPD to stifle any competition to the two major parties in the 2016 presidential election if the Court does not intervene quickly.  The 2016 presidential campaign is already under way, and potential third-party and independent candidates need to begin the organizing and fundraising now if they want to compete.  In particular, the monumental task of getting the signatures necessary to secure ballot access in all 50 states requires significant organizational and fundraising capacity and needs to begin imminently, as the earliest deadlines in some jurisdictions are only months away.  There are many accomplished

---

[5] *See* Ann M. Ravel, *How Not to Enforce Campaign Laws*, N.Y. Times (Apr. 2, 2014), http://www.nytimes.com/2014/04/03/opinion/how-not-to-enforce-campaign-laws.html?_r=0.

[6] Eric Lichtblau, *F.E.C. Can't Curb 2016 Election Abuse, Commission Chief Says*, N.Y. Times (May 2, 2015), http://www.nytimes.com/2015/05/03/us/politics/fec-cant-curb-2016-election-abuse-commission-chief-says.html.

[7] *See* First General Counsel's Report, MURs 4451 and 4473 (Commission on Presidential Debates) (Feb. 6, 1998) (finding reason to believe CPD violated FEC's debate regulations), *rejected in* Statement of Reasons, MURs 4451 and 4473 (Commission on Presidential Debates) (Apr. 6, 1998).

American citizens who could make good, or even great, Presidents, but are deterred from running because they do not want to participate in the Democratic or Republican primary process.  These potential independent candidates, moreover, will be deterred from engaging in efforts necessary to obtain ballot access if the current discriminatory debate rules remain in place, because there will be no point to running a campaign if they have no chance to present their ideas to the public in the debates.[8]  And those candidates who might still attempt a campaign will find it more difficult to raise money and build staff at this key juncture because would-be supporters will decline to assist knowing that the candidate will be denied access to the debates, and thus denied a legitimate chance to compete, under the current system.

13.     Accordingly, Plaintiffs bring this action for declaratory and injunctive relief to prevent another election under a skewed and illegal debate system.  Specifically, Plaintiffs request that the Court either:

a.   Direct the FEC to find that the CPD has violated 11 C.F.R. § 110.13 by staging candidate debates in a partisan manner and without pre-established, objective criteria; violated 52 U.S.C. § 30118(a) by making prohibited contributions and expenditures; violated 52 U.S.C. § 30116(f) by accepting prohibited contributions; and violated 52 U.S.C. §§ 30103 and 30104 by failing to register as a political committee and by failing to make required reports and disclosures; or

b.   Authorize Plaintiffs to bring a civil action against the CPD, its executive director, and the 11 directors who have participated in these past violations, and if the CPD adopts rules for the 2016 election that violate § 110.13, the six remaining directors who joined the CPD after the 2012 election, to remedy those violations of federal election law; and

---

[8] *See* James K. Glassman, *Presidents All Around Us*, Politico Magazine (Apr. 26, 2015), http://www.politico.com/magazine/story/2015/04/presidents-all-around-us-117366.html#.VT2KRor3bCQ.

  c. Order the FEC to open a rulemaking to revise its rules governing presidential

debates to ensure that debate sponsors do not unfairly exclude independent and third-

party candidates from participating.

## JURISDICTION AND VENUE

  14. This Court has jurisdiction under 52 U.S.C. § 30109(a)(8)(A) and 28 U.S.C.

§ 1331.

  15. Venue in this district is proper pursuant to 52 U.S.C. § 30109(a)(8)(A) and 28

U.S.C. § 1391(e).

## PARTIES

  16. Plaintiff Level the Playing Field ("LPF") is a nonpartisan, nonprofit corporation

not affiliated with any candidate or candidate committee.  Its purpose is to promote reforms that

allow for greater competition and choice in elections for federal office, particularly for the

Presidency and Vice Presidency.  LPF is the successor to Americans Elect ("AE"), which

obtained signatures sufficient to qualify for ballot access in 41 states in connection with the 2012

presidential election.  LPF intends to recruit qualified independent candidates to run for President

and Vice President on an LPF ticket in the 2016 election.

  17. Plaintiff Dr. Peter Ackerman is a United States citizen and a registered voter in

the District of Columbia who is interested in the presidential electoral process and is committed

to reforming politics and elections in the United States.

  18. Plaintiff Green Party of the United States (the "Green Party") evolved from

gatherings of people concerned with various matters that included ecology, civil rights, and

peace to a more formalized and structured political party.  Candidates of the Green Party and

predecessor organizations competed in presidential elections in 2000, 2004, 2008 and 2012, and

the Green Party intends to nominate candidates for President and Vice President in the 2016 election.

19.     Plaintiff Libertarian National Committee, Inc. controls and manages the affairs and resources of the United States Libertarian Party (the "Libertarian Party"), the third largest political party in the country.  The Libertarian Party has nominated presidential candidates in every presidential election since its formation in 1971, and intends to nominate candidates for President and Vice President in the 2016 election.

20.     Defendant FEC is an independent federal agency charged with the administration and civil enforcement of FECA.  52 U.S.C. § 30106(b).

## STATUTORY AND REGULATORY FRAMEWORK

21.     The primary purpose of FECA is to "limit *quid pro quo* corruption and its appearance."  *McCutcheon v. Fed. Election Comm'n*, 134 S. Ct. 1434, 1444 (2014).  To achieve this purpose, FECA prohibits corporations from making many types of contributions or expenditures "in connection with" any federal election.  52 U.S.C. § 30118(a).  It also requires disclosure of most federal political contributions and expenditures.  *See, e.g.*, *id.* § 30104.

22.     Absent a specific exemption, FECA's prohibitions on corporate campaign spending would preclude corporate funding of candidate debates.  FECA's definitions of contribution and expenditure are broad, *see id.* § 30101(8)(A), 9(A), and corporate funding of a public forum in which a candidate can appear to influence voters is generally prohibited by FECA.  *See* 11 C.F.R. § 100.52(d)(1) (noting that "[u]nless specifically exempted" under the FEC's regulations, "the provision of any goods or services without charge or at a charge that is less than the usual and normal charge for such goods or services is a contribution"); 11 C.F.R. § 100.111(e)(1) (same for expenditures).  The FEC has expressly recognized that corporate

9

funding of candidate debates creates "the real or apparent potential for a quid pro quo" corrupt payment and jeopardizes the "integrity and fairness of the [debate] process."  Corporate and Labor Organization Activity; Express Advocacy and Coordination With Candidates, 60 Fed. Reg. 64,260, 64,262 (Dec. 14, 1995).

23.     Since 1980, however, the FEC has created an exception to FECA's bans on corporate contributions and expenditures that permits corporations to fund debates, but only under certain specified conditions.  *See* Funding and Sponsorship of Federal Candidate Debates, 44 Fed. Reg. 76,734, 76,734 (Dec. 27, 1979).  Pursuant to that exception, the FEC has adopted rules to ensure that debates are not a means for corporate donors to give favored candidates an improper advantage.

24.     First, debate staging organizations must be nonpartisan.  That means a debate sponsor (that is not a media outlet) must be a nonprofit organization that qualifies for tax-exempt status under Sections 501(c)(3) or 501(c)(4) of the Internal Revenue Code and "do[es] not endorse, support, or oppose political candidates or political parties."  11 C.F.R. § 110.13(a).[9]  In addition, staging organizations "shall not use nomination by a particular political party as the sole objective criterion to determine whether to include a candidate in a debate."  *Id.* § 110.13(c). The resulting debate must be nonpartisan too, and cannot favor one candidate over others.  *See id.* § 110.13(b)(2).

25.     Second, debate staging organizations must use "pre-established objective criteria to determine which candidates may participate in a debate."  11 C.F.R. § 110.13(c).

_____

[9] *See* 26 U.S.C. § 501(c)(3) (prohibiting 501(c)(3) organizations from "participat[ing] in, or interven[ing] in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office"); *id.* § 501(c)(4) (limiting 501(c)(4) status to entities that "operate[] exclusively for the promotion of social welfare").

26.     The FEC has determined that to be objective, a criterion "must be free of content bias, and not geared to the selection of certain pre-chosen participants."  First General Counsel's Report at 7, MUR 5395 (Dow Jones) (dated Jan. 13, 2005, approved by the FEC on Jan. 19, 2005).  Under this definition, objectivity means more than subject to verifiable measurement.  It incorporates a "reasonableness" requirement.  *Buchanan v. Fed. Election Comm'n*, 112 F. Supp. 2d 58, 74 (D.D.C. 2000).  In particular, a criterion that "only the Democratic and Republican nominees could reasonably achieve" does not satisfy the FEC's rules.  *Id.*

27.     A debate staging organization cannot use corporate money to pay for candidate debates unless it satisfies these criteria.  *See* 11 C.F.R. § 114.4(f).  Likewise, if a debate staging organization does not meet these criteria, it must publicly disclose its contributors as any other political committee would.

## FACTS GIVING RISE TO PLAINTIFFS' ADMINISTRATIVE COMPLAINT

28.     The CPD has sponsored every general election presidential and vice presidential debate since 1988, including four in 2012.  The CPD pays for these events using millions of dollars provided by large multinational corporations, as explained *infra* at ¶¶ 72-74, 78.

### A.     The CPD Is Not A Nonpartisan Organization; It Supports The Democratic And Republican Parties And Opposes Third Parties And Independents

29.     Nonpartisanship has been a core requirement for debate sponsors since the FEC first authorized corporate debate funding more than thirty years ago.  At that time, the FEC contemplated that debate sponsors would have "a history of nonpartisanship" that would be a bulwark against partisan rigging of the debates.  Explanation and Justification, Funding and Sponsorship of Federal Candidate Debates, 44 Fed. Reg. 39,348, 39,348 (July 5, 1979).

30.     The CPD violates this requirement today, and has done so since its inception.  The CPD as a debate sponsor endorses and supports only the Democratic and Republican parties and

their candidates for president and vice president, and opposes third parties and third-party and

independent candidates for president and vice president.

31.     In 1985, the respective chairmen of the Republican and Democratic National

Committees, Frank Fahrenkopf, Jr. and Paul G. Kirk, Jr., agreed that the two major parties

should wrest control of the presidential debates away from the League of Women Voters (the

"League"), which had sponsored the general election presidential debates in 1976, 1980, and

1984.  Fahrenkopf and Kirk entered an agreement expressing their intention to replace League-

sponsored debates with "nationally televised joint appearances conducted between the

presidential and vice presidential nominees of the two major political parties."[10]  That agreement

envisaged the use of these "televised joint appearances" as a means to cement the two parties'

electoral position:

> It is our bipartisan view that a primary responsibility of each major political party is to
> educate and inform the American electorate of its fundamental philosophy and policies as
> well as its candidates' positions on critical issues.  One of the most effective means of
> fulfilling that responsibility is through nationally televised joint appearances conducted
> between the presidential and vice-presidential nominees of the two major political parties
> during general election campaigns.  Therefore, to better fulfill our parties' responsibilities
> for educating and informing the American public and to strengthen the role of political
> parties in the electoral process, it is our conclusion that future joint appearances should be
> principally and jointly sponsored and conducted by the Republican and Democratic
> National Committees.[11]

The Democratic and Republican National Committees formally approved Fahrenkopf and Kirk's

proposal for the parties to take over presidential debates soon thereafter.

32.     The CPD is the direct outgrowth and implementation of Fahrenkopf and Kirk's

agreement and reflects their expressed intention to limit access to the presidential debates to the

major parties' nominees.  Announcing the CPD's formation in 1987, Fahrenkopf and Kirk

---

[10] Frank Fahrenkopf & Paul Kirk, Memorandum of Agreement on Presidential Candidate Joint
Appearances (Nov. 26, 1985), *available at* http://www.opendebates.org/theissue/memo.jpg.
     [11] *Id.*

explained, "We have no doubt that with the help of the Commission we can forge a permanent framework on which all future presidential debates *between the nominees of the two political parties will be based*."[12]  Fahrenkopf and Kirk made clear at the announcement their hope that the CPD would exclude third-party and independent candidates from the debates.

33.     At the founding of the CPD, the Democratic and Republican parties described the organization as "a *bipartisan*, non-profit, tax-exempt organization formed to implement joint sponsorship of general election presidential and vice-presidential debates, starting in 1988, *by the national Republican and Democratic committees* between their respective nominees."[13]  Consistent with that intention, the CPD has routinely deferred to the major parties' and/or their nominees' preferences for how to conduct the debates.

34.     Since 1988, the Democratic and Republican nominees have entered into memoranda of understanding dictating myriad aspects of how they want the general election debates to be conducted, addressing dates, places, formats, camera placement, audience reaction shots, selection of moderators and panelists, etc.  The CPD has accepted the campaigns' agreed-upon debate terms reflected in these memoranda without question.  The CPD has thereby enabled the major-party candidates to agree on moderators, put checks on candidate-to-candidate questioning, pre-screen town hall questions, and limit the response times and number of follow up questions.  When a complainant brought this practice to the FEC's attention in 2004, the CPD was not able to point to a single instance where it had contravened the major party candidates' wishes.

---

[12] Press Release, News from the Democratic and Republican National Committees, Feb. 18, 1987 (emphasis added), *available at* http://www.opendebates.org/theissue/CPDrelease.pdf.
[13] *Id.* (emphases added).

35.     The CPD has also deferred to the major parties and their candidates to determine who to invite to the general election debates.

36.     In 1992, the CPD's Advisory Committee concluded that third-party candidate Ross Perot should be invited to the first debate and his inclusion in the second and third debates should be subject to further review, and communicated that conclusion to the campaigns of the Republican and Democratic nominees, President George H.W. Bush and Governor Bill Clinton. The Bush and Clinton campaigns, however, both wanted Perot to be included in all three debates because each perceived this to be politically advantageous.  The campaigns jointly instructed the CPD to include Perot in all three debates and the CPD, disregarding its own Advisory Committee, complied.

37.     In 1996, the CPD excluded Ross Perot from the debates, even though he had received nearly 19% of the vote in the 1992 general election.  It did so because this time, the campaigns of the Republican and Democratic nominees decided that he should not participate. As a senior Clinton campaign official explained, "[The Dole campaign] didn't have leverage going into the negotiations.  They were behind, they needed to make sure Perot wasn't in it.  As long as we would agree to Perot not being in it we could get everything else we wanted going in. We got our time frame, we got our length, we got our moderator."[14]  The CPD, as it did in 1992, honored the major-party candidates' self-interested agreement about whether to permit Perot to debate.

38.     The CPD's leadership structure is purposefully designed to permit this type of partisan rigging of the debates.  The CPD's leadership includes Republican and Democratic partisans with partisan interests, who are accountable to no one, and who have not created any

---

[14] David Broder, Campaign For President: The Managers Look at '96 at 170 (1997).

14

mechanism for considering the interests of third-party and independent candidates, or adopted rules that would ensure that its Board members are not laboring under conflicts of interest because of their partisan activities.

39.     The CPD has always had chairmen with deep ties to the Republican and Democratic parties.

40.     Fahrenkopf has been a co-chair of the CPD from its founding to the present. Before and during his time on the CPD, Fahrenkopf has remained an active Republican partisan and influential lobbyist:

a.     He was chair of the Republican National Committee from 1983 to 1989.

b.     He has given over $90,000 to Republican candidates and causes during his tenure at the CPD, including more than $23,000 in between 2008 and 2012 and more than $35,000 in the 2014 election cycle.

c.     In 2011, Fahrenkopf authored an op-ed calling for the Republican Party to find a "dynamic and hardworking new chairman" who could win the trust of "*our major-donor base*" and "rebuild the tattered reputation and organization of *our great party*."[15]

d.     Fahrenkopf has even donated to the presidential campaign of at least one candidate appearing in the CPD's debates, George W. Bush.

e.     During the last presidential election, Fahrenkopf was the head of the American Gaming Association, which spent more than $3.5 million on lobbying activities in 2011 and 2012 and gave over $150,000 to Democratic and Republican candidates in that span.

41.     Kirk was a co-chair of the CPD from its founding until 2009.  Before and during his time on the CPD, Kirk was a leading Democratic activist:

---

[15] Frank Fahrenkopf and Jim Nicholson, *Don't Repeat Error of Picking Steele*, Politico (Jan. 12, 2011, 4:37 a.m.), http://www.politico.com/news/stories/0111/47440.html (emphases added).

a.       From 1985 to 1989, he served as chairman of the Democratic National Committee.

b.       While still co-chairman of the CPD, Kirk served as a Democratic superdelegate who publicly declared support for Barack Obama in May 2008.  Kirk touted that Obama would "bring young and new and independent voters to the Democratic banner in November."[16]

c.       Kirk left his CPD position to accept an appointment from Deval Patrick, a Democratic governor and close Obama ally, to take Ted Kennedy's seat as a Democratic member of the Senate.

42.       Mike McCurry, a longtime Democratic insider – the holder of "a variety of leadership roles in national campaigns for the Democratic ticket from 1984 to 2004" according to his professional biography[17] – replaced Kirk as co-chair in 2009 and remains in that position. Before and during his time at the CPD, McCurry has remained an active Democratic partisan and influential lobbyist:

a.       McCurry was a key player in the Clinton campaign when, upon information and belief, it and Bob Dole's campaign ensured that the CPD excluded Ross Perot from the 1996 debates.

b.       From 2008 through 2012, McCurry gave nearly $85,000 to Democrats, including $7,500 to 2016 presidential candidate Hillary Clinton.

c.       McCurry is a principal at Public Strategies Washington, Inc., a lobbying firm for major corporations whose clients include CPD sponsors Anheuser-Busch and Southwest Airlines, which give hundreds of thousands of dollars to Democratic and Republican candidates.

---

[16] Jonathan D. Salant, *Former Democratic Party Leader Paul Kirk Backs Obama*, Bloomberg.com (May 2, 2008 2:22 p.m.), http://www.bloomberg.com/apps/news?pid=newsarchive&sid=aBtdfyDJEwZM&refer=home.
[17] Michael D. McCurry, Public Strategies Washington Inc., http://www.psw-inc.com/team/member/michael-d.-mccurry (last visited June 16, 2015).

43.     There is a network of ties between the other members of the CPD leadership and the major parties:

a.     The CPD's executive director, Janet Brown, served as an aide to top Republicans before taking over her present office in 1987.

b.     Two former Republican senators, John Danforth and Alan Simpson, are on the CPD board.

c.     Democratic board representatives include Newton Minow, a close aide to Adlai Stevenson and a Kennedy appointee to the Federal Communications Commission; and Antonia Hernandez, who served as counsel to the Senate Committee on the Judiciary when it was led by Ted Kennedy.

d.     CPD board member Richard Parsons and his wife gave more than $100,000 to Republican candidates and party committees between 2008 and 2012.

e.     Howard Buffett, a CPD board member since at least 2000, contributed to Barack Obama's 2008 presidential campaign the *very same month* that the CPD sponsored the debates between Obama and John McCain.

f.     CPD board member Dorothy Ridings has contributed to Democratic campaigns.

g.     The CPD has six new directors who joined the board in April 2014.[18]  These six directors were not involved in the CPD's past decisions regarding debate access, but will be involved in setting the rules for the 2016 election.  Nonetheless, and even though the CPD must be nonpartisan, one of the new members, Leon Panetta (a former Democratic congressman who

---

[18] The six new members are Mitchell E. Daniels, Jr., Charles Gibson, Jane Harman, Leon E. Panetta, Olympia Snowe and Shirley M. Tilghman.

17

served in the Cabinet under Presidents Clinton and Obama), has publicly endorsed Hillary

Clinton's 2016 presidential campaign.[19]

44.     In contrast to these partisan ties, nothing suggests that the CPD has any

institutional mechanisms to check Democratic and Republican influence or to protect the

interests of third parties and independents:

a.     According to one CPD board member, the board may meet as infrequently as

once a year, and generally by conference call.

b.     For years, the CPD reported in IRS filings under penalty of perjury that its board

members devoted zero hours per week to the organization, even in presidential election years.

c.     Many board members do not even bother to attend the debates.  Five of eleven

board members were absent from the first presidential debate in 2012, and Fahrenkopf noted that

that attendance level was an *accomplishment*.

d.     The CPD board nominates its own members, without any oversight.  Moreover,

its bylaws have given the two chairmen of the organization – *i.e.*, veteran insiders of the two

major parties – the unilateral power to determine which directors could nominate candidates for

board admission, and unchecked discretion in filling vacancies occurring before a director's

official term expired.

e.     The CPD apparently has no rules preventing board members from cultivating and

maintaining active partisan ties.  Its conflict of interest policy, for example, is entirely silent

when it comes to partisan activity.

45.     Fahrenkopf confirmed this overwhelming evidence of the CPD's bipartisan bias

just last month.  Appearing in a television news interview in his role as co-chair of the CPD to

---

[19] Lucy McCalmont, *Leon Panetta goes all in for Hillary Clinton*, Politico (Oct. 14, 2014 11:52 p.m.),
http://www.politico.com/story/2014/10/leon-panetta-hillary-clinton-111892.html.

discuss its debate sponsorship activities, Fahrenkopf admitted that the CPD's "system" for selecting candidates consists of "go[ing] with the two leading candidates, it's [sic] been the two political party candidates."[20]   The FEC's rules, of course, prohibit a debate sponsor from having a candidate selection system designed to include the Republican and Democratic nominees and exclude all others.   Yet Fahrenkopf admitted that that is exactly what the CPD does: it uses a "system" designed to include only "the two leading candidates," *i.e.*, "the two political party candidates."

### B.    The CPD Uses Subjective Candidate Selection Criteria That Are Designed To Exclude Third-Party And Independent Candidates

<u>The CPD's Selection Criteria</u>

46.    In 2012, as well as in the three previous presidential elections, the published criteria for participation in a CPD debate were that the candidate: (1) be constitutionally eligible for office, (2) have his or her name appear on enough state ballots to have a mathematical chance of securing an Electoral College majority, and (3) have a level of support of at least 15% of the national electorate as determined by five selected national public opinion polling organizations, using the average of those organizations' most recent publicly-reported results at the time of the determination.

47.    The date for determining satisfaction of the 15% rule is not specified in advance; the CPD states it makes its determination after Labor Day but "sufficiently in advance of the first-scheduled debate to allow for orderly planning."[21]   The determination typically first occurs in mid-September.

---

[20] Fahrenkopf Interview, *supra note* 2.
[21] 2012 Candidate Selection Criteria, Commission on Presidential Debates, http://www.debates.org/index.php?page=candidate-selection-process (last visited June 16, 2015).

48.     The polls that the CPD claims to rely upon are not announced, either in advance or upon application of the criteria.  In 2012, the CPD announced that it applied its polling criterion "with the assistance of the Editor-In-Chief of the Gallup Polling Organization, Dr. Frank Newport," but it did not announce the five polls it purportedly consulted.[22]

49.     The CPD has purported to rely on these criteria in the 2000, 2004, 2008, and 2012 elections.  In each of those elections, the CPD invited only the Democratic and Republican nominees to the debates it sponsored.

50.     The CPD has begun preparations to host the general election debates for the 2016 election, having already requested proposals from sites interested in hosting a 2016 presidential or vice presidential debate.  Upon information and belief, the CPD intends to use the same candidate selection criteria for the 2016 presidential elections that it used in the 2012 cycle, and the three cycles before that.

### The CPD's 15% Rule Is Biased Against Independent And Third Party Candidates

51.     The FEC requires debate sponsors to "use pre-established objective criteria to determine which candidates may participate in a debate."  11 C.F.R. § 110.13(c).  Many rules can seem objective on the surface but nonetheless operate in practice as a means for improperly excluding independent candidates.  To guard against this possibility, the FEC has explained that the objectivity requirement means that the criteria "must be free of 'content bias,' and not geared to the selection of certain pre-chosen participants."  First General Counsel's Report at 7, MUR 5395 (Dow Jones) (dated Jan. 13, 2005, approved by the FEC on Jan. 19, 2005).  And in particular, "the objectivity requirement precludes debate sponsors from selecting a level of

---

[22] *See* 2012 Application of Criteria, Commission on Presidential Debates (Sept. 21, 2012), http://www.debates.org/index.php?mact=News,cntnt01,detail,0&cntnt01articleid=42&cntnt01origid=27&cntnt01detailtemplate=newspage&cntnt01returnid=80.

support so high that only the Democratic and Republican nominees could reasonably achieve it." *Buchanan*, 112 F. Supp. 2d at 74.

52.     The CPD's 15% rule does not satisfy the objectivity requirement of the FEC regulations.  No third-party or independent candidate has satisfied this polling criterion in the four election cycles in which it has been in place; nor would Ross Perot have satisfied it had it been in effect in 1992 or 1996.  Plaintiffs have submitted new empirical studies demonstrating that as a practical matter, it is impossible for a candidate unaffiliated with the major parties – no matter how qualified to be president – to reasonably be expected to achieve the required 15% level of support.[23]

53.     A candidate seeking to satisfy the CPD's rule needs to become sufficiently well known nationally in order to attract the support of 15% of the electorate.  Data show that, on average, a candidate would have to achieve, at a minimum, 60% national name recognition to have a chance at achieving 15% voter support.  It is likely, moreover, that the necessary name recognition is much higher, approaching 80% or above.

54.     Achieving those levels of name recognition is much easier for candidates who compete in the major party primaries than it is for those who do not.  The primary process provides a mechanism for Democratic and Republican hopefuls to generate name recognition, and, in turn, voter support, at a manageable cost.  Candidates without a national profile can raise the money necessary to become competitive in the small, early primary states.  That, in turn,

---

[23] The data and conclusions in paragraphs 53 through 67 are taken from two expert reports submitted with Plaintiffs' administrative complaint.  One report, by Dr. Clifford Young, head of U.S. Public Affairs at the polling firm Ipsos, contains a detailed, quantitative analysis demonstrating (1) that a non-major-party candidate would need extremely high name recognition to satisfy the CPD's rule, and (2) that, even if he or she could achieve it, the inaccuracies of polling in a three-way race would often result in his or her exclusion from the debates.  The other report, by veteran campaign consultant and pollster Douglas Schoen, demonstrates that the cost of achieving the name recognition necessary to satisfy the CPD's rule is prohibitively expensive for an independent or third-party candidate.  Both reports can be found online at http://www.changetherule.org/wp-content/themes/rule/pdfs/ ChangeTheRule_Book.pdf.

leads to media coverage, inclusion in the primary debates, and other free avenues to enhanced name recognition.

55.     By contrast, candidates unaffiliated with the Democratic and Republican parties have no similar opportunities to build name recognition within a relatively modest budget; as a practical matter it is virtually impossible for such candidates to satisfy the 15% threshold.

56.     First, these candidates do not have the benefit of a party brand identity to inflate their vote share.  Democratic and Republican candidates receive a default level of vote share by virtue of their partisan affiliation alone.

57.     Second, unlike Democratic and Republican hopefuls who benefit from press coverage of the primary process, independent and third-party candidates lack an institutionalized process for obtaining free media that can generate name recognition.  Indeed, the media pay little attention to these candidates at all; as leading political analyst Chuck Todd put it, these candidates "typically don't get the media attention – *and thus name ID* – that Democrats and Republicans get."[24]

58.     As a result, an independent candidate would have to rely on paid media to become known and to communicate his or her message.  Experienced pollster and campaign strategist Doug Schoen estimates that the cost of just the advertising necessary to achieve 60% name recognition for an independent candidate would be in the ballpark of $113 million, at an absolute minimum.  To achieve 80% name recognition – the amount more likely necessary to clear the 15% hurdle – the candidate would have to spend $150 million on paid media.

---

[24] Chuck Todd, Mary Murray & Carrie Dan, *Independents' Day? Game Rigged Against Third-Party Candidates*, NBC News (July 3, 2014 9:12 a.m.), http://www.nbcnews.com/politics/first-read/independents-day-game-rigged-against-third-party-candidates-n147331.

59.     No third-party or independent candidate has ever raised $113 million, much less

$150 million.  Indeed, $113 million is more than what Mitt Romney's campaign spent to win the

Republican nomination in 2012.

60.     That $113 million, moreover, is only the cost directly associated with paid media.

Campaigns must incur many other costs to boost a candidate's name recognition and publicize

his or her message to voters.  For example, campaigns must pay for staff, consultants, polling,

legal advice, travel, events, direct mail, and many other things.  A candidate seeking to be

competitive with the major party candidates would likely budget to spend more than $133

million on these other campaign costs (roughly 75% of what Mitt Romney's campaign paid for

nonmedia related expenses in the 2012 general election).  Adding up these costs for paid media,

campaigning generally, and ballot access, a third-party or independent candidate is looking at a

budget of more than $253 million to mount a competitive bid and achieve poll results of 15% or

more in September.  Factor in the approximate 5% growth in costs that occurs from one

presidential cycle to the next, and that number rises to $266 million in 2016.

61.     It is simply not reasonably feasible for a third-party or independent candidate to

raise this kind of money just to achieve the necessary name recognition.  Most political donors

are repeat donors who are invested in the success of one or both of the major parties, and are

extremely unlikely even to consider a contribution to a candidate unaffiliated with those parties.

And given the $5,400 limit for individual contributions to candidates, a candidate would need to

solicit millions of people to raise the necessary funds and would have to achieve massive

fundraising success before obtaining significant name recognition, which makes fundraising

much harder.  There is no evidence that it is reasonably possible for an independent or third-party candidate to achieve this level of fundraising.[25]

62.      In sum, without unparalleled amounts of campaign cash that no independent or third-party candidate has ever raised or spent, it is not reasonably possible for a third-party or independent candidate to achieve the name recognition necessary to poll at 15%.

63.      Even if that were possible, however, the CPD's rule still systematically and arbitrarily disadvantages third-party and independent candidates.  This bias is a second reason why the 15% rule is not objective.

64.      The CPD's rule leaves third-party and independent candidates at the mercy of arbitrary decisions of pollsters and the CPD on whom to poll, when to poll, what polls to consider, and when to make the debate selection determination.  Indeed, the CPD does not use objective, pre-determined criteria to select which five polls to average or precisely when to take that average.  As a result, the selection of which polls to include and when to average them is subject to manipulation to achieve particular results.

65.      Moreover, as recent elections demonstrate, polls are often highly misleading,[26] and data prove that polls in three-way races are subject to heightened inaccuracy due to increased sampling errors that occur as a result of the unique challenges posed by polling a three-way race.

---

[25] Unaffiliated candidates also have no ability to benefit from party donations.  Under new rules adopted by the current Congress, individuals can give up to $1,668,000, to party committees for the 2015-16 election cycle.  (That total includes contributions of up to $334,000 to national party committees and party committee accounts for each of 2015 and 2016, and an additional $500,000 to state, district and local party committees for each of 2015 and 2016 ($10,000 per state, district or local committee of each state per year, with total contributions unlimited under *McCutcheon*, 134 S. Ct. at 1462), *i.e.*, $834,000 per year or $1,668,000 for the 2015-16 cycle.)  *See* Fed. Election Comm'n, http://www.fec.gov/ans/answers_general.shtml#How_much_can_I_contribute (last visited June 16, 2015).

[26] For example, pre-election polls in the 2014 midterm elections were grossly inaccurate, as evidence Plaintiffs submitted to the FEC shows.  *See* Comment of Level the Playing Field, Rulemaking Petition:  Candidate Debates at (Dec. 2, 2014), *available at http://sers.fec.gov/fosers/showpdf.htm?docid=*310980.  More recently, polls taken on the eve of the 2015 U.K. elections were far off the mark.  *See* Dan Bilefsky, *British Election's Other Losers:  Pollsters*, N.Y. Times (May 8, 2015), http://www.nytimes.com/2015/05/09/world/europe/uk-british-election-polling.html.

Because of the inaccuracy, the CPD's rule can often exclude a candidate who actually draws 15% support.

66.     At the expected average error rate of three-way polls, a hypothetical candidate with 17% support would nonetheless fail to satisfy the CPD's 15% rule 40.2% of the time.  In contrast, at the same error rate, a hypothetical candidate with 42% support would only fail to satisfy the CPD's rule .04% of the time.  In other words, 4 out of 10 times, the CPD's rule will exclude the 17% candidate from the debates, but only 4 out of 1000 times will it exclude the 42% candidate from the debates.

67.     The high risk of a false negative resulting from the application of the CPD's rule hurts only the third-place candidate, which, in almost all cases, will be the third-party or independent candidate under the present system.  As a result, because of the inaccuracy of three-way polling, the CPD's rule is systematically skewed to reduce an independent candidate's chance of satisfying it.

68.     Additionally, the mid-September timing of the CPD's 15% determination also violates the FEC's objectivity requirement.  By postponing the application of its 15% determination until September, the CPD forces third-party and independent candidates to endure months of uncertainty about whether they will be in the debates, while their Democratic and Republican competitors will know by May (when their nominations have become certain) that they will be invited to the debates.

69.     Because they know the CPD has never and would never exclude a Republican or Democratic nominee from the debates, the Republican and Democratic candidates can be sure that they can participate in the debates from the moment they secure their parties' nominations. Even if the CPD actually applied the 15% rule to Democratic and Republican candidates, those

candidates could rely on the support of devout partisans to clear that hurdle, as explained *supra*. Thus, the Democratic and Republican nominees face no uncertainty when it comes to debate participation.

70.     In contrast, a third-party or independent candidate must campaign for months under uncertainty as to whether he or she will have access to the debates.  This uncertainty creates concrete harms that themselves make it even more impossible to poll at 15% in September.  Without guaranteed access to the debates, the media is much less likely to cover the candidate, which inhibits the candidate's ability to raise money and build support.  Moreover, given that participation in the debates is a prerequisite to victory, many prospective donors will not contribute to a candidate who has not yet qualified for the debates.

71.     That uncertainty puts the non-major party candidates at an enormous disadvantage, and creates yet another Catch-22:  The CPD requires independent candidates to raise an unprecedented sum of money in order to reach 15% in the polls in September, yet by postponing the determination of debate access to September, the CPD creates additional hurdles to raising that money.  For this reason too, the CPD's rule is biased and designed to exclude third-party and independent candidates.

**C.     The CPD's Exclusionary Debates Further Corruption Of The Electoral Process And The Appearance Of Corruption**

72.     The CPD takes in millions of dollars of contributions from large multinational corporations each presidential cycle.  Its roster of known corporate backers has included The Anheuser-Busch Companies, Southwest Airlines, BBH New York, Electronic Data Systems, American Airlines, AT&T, Ford, Philip Morris Companies, Inc., IBM, J.P. Morgan & Co, and other major corporations.

73.     The CPD received nearly $8 million in contributions in 2011 and 2012.  Upon information and belief, most of that money came from large corporations.

74.     Upon information and belief, the CPD in 2012 spent nearly $3.7 million to organize, produce, finance and publicize the general election debates.  These expenditures paid for extensive media exposure for the Democratic and Republican candidates, both through the debates themselves and through media coverage of them.

75.     In addition to funding the debates, the political action committees of the corporate sponsors of the CPD, upon information and belief, donate more than $1.5 million to the two major parties every year in order to sustain a two-party system that supports their interests, and spend millions more lobbying elected officials from the two parties.  In light of their investment in the two-party system, these corporations would necessarily disfavor the prospect of a third-party candidate winning the presidency; it would render their existing investment in the two-party system much less valuable.

76.     Upon information and belief, the CPD's sponsor corporations often contribute to both Republicans and Democrats in order to buy broad influence.  It is cheaper to pay for influence over two candidates than it is three, which is yet another reason corporations do not want a viable third alternative to emerge.

77.      The CPD's biased 15% rule thus allows corporations to further a corrupt interest in limiting political competition.

78.     The CPD's corporate sponsors also effectively pay for the more than $350,000 in annual compensation that CPD executive director Janet Brown receives, thereby ensuring that the CPD's purportedly full-time leader will not challenge corporate interest in stifling political competition.

79.     Corporate sponsorship of exclusionary, partisan debates also contributes to the public's perception that the two parties are beholden to corporate interests.

80.     The public is dissatisfied with the Republican and Democratic parties.  Sixty-two percent of Americans do not think the federal government has the consent of the governed,[27] and 86% feel the political system is broken and does not serve the interests of the American people.[28]

81.     At the same time, the public prefers more inclusive presidential debates; 50% of Americans believe that the debates would be improved if a third candidate from outside the two major parties were included.[29]  The numbers are even higher when a specific third candidate is at issue:  Fifty-six percent of respondents in a 2000 poll said that Ralph Nader and Pat Buchanan should have been included in the presidential debates,[30] and 62% of Americans wanted Perot to participate in the 1996 debates.[31]

82.     In light of these public attitudes, there is a clear risk that the public will view corporate sponsorship of exclusionary debates as a corrupt bargain between the major parties and their corporate patrons to deny the American people true electoral choice.

### PLAINTIFFS' ADMINISTRATIVE COMPLAINT

83.     On September 11, 2014, Plaintiffs Level the Playing Field and Peter Ackerman filed an administrative complaint against the CPD, its executive director, and the 11 of its

---

[27] *68% Think Election Rules Rigged for Incumbents*, Rasmussen (July 13, 2014), http://www.rasmussenreports.com/public_content/politics/general_politics/july_2014/68_think_election_rules_rigged_for_incumbents.

[28] Douglas E. Schoen, Independents and the Presidential Debate System at 9 (Aug. 29, 2014), *available at* http://www.changetherule.org/wp-content/themes/rule/pdfs/ChangeTheRule_Book.pdf.

[29] *See id.* at 14.

[30] Thomas E. Patterson, Election 2000: How Viewers 'See' a Presidential Debate 5 (2000), *available at* http://shorensteincenter.org/wp-content/uploads/2012/03/vv_debate_paper.pdf.

[31] *Debate Commission Excludes Perot*, CNN, (Sept. 17, 1996), http://cgi.cnn.com/ALLPOLITICS/1996/news/9609/17/debate.announce/.

directors who participated in adopting its rules for the last presidential election.[32]  On June 16,

2015, Plaintiff the Green Party joined that administrative complaint.  On June 18, 2015, Plaintiff

the Libertarian Party also joined that administrative complaint.

84.     Based on the facts and evidence documented in the administrative complaint and

exhibits appended thereto, Plaintiffs alleged that the CPD and these 12 directors violated the

FEC's debate sponsorship regulations.  For the reasons set forth above, and presented in greater

detail in the administrative complaint and the extensive record evidence submitted in support of

that complaint, Plaintiffs established that the CPD's sponsorship of the debates violated FEC

regulations because (1) the CPD is not a nonpartisan organization and (2) the CPD's 15% polling

criterion is not objective as required by the FEC's rules.

85.     Because the CPD violated the FEC's debate regulations, its expenditures on

debates, receipt of corporate contributions to fund those expenditures, and failure to report those

expenditures and contributors all also violated FECA.

86.     *First*, the CPD violated FECA by making illegal corporate campaign

contributions.  FECA prohibits corporations, including the CPD, from making contributions to

political candidates, 52 U.S.C. § 30118(a), and defines contributions broadly to include the

provision of any good or service free of charge, *see* 11 C.F.R. § 100.52(d)(1) (defining in-kind

contribution as "the provision of any goods or services without charge or at a charge that is less

than the usual and normal charge for such goods or services").  The CPD's provision of free

televised campaign fora to the Democratic and Republican candidates were illegal corporate

campaign contributions.

---

[32] The 11 directors are: Frank Fahrenkopf, Jr., Michael D. McCurry, Howard G. Buffett, John C. Danforth, John Griffen, Antonia Hernandez, John I. Jenkins, Newton N. Minow, Richard D. Parsons, Dorothy Ridings, and Alan K. Simpson.  The executive director is Janet Brown.

87.    *Second*, the CPD violated FECA by making illegal corporate campaign expenditures.  Under FECA, an "expenditure" includes "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office."  52 U.S.C. § 30101(9)(A)(i).  FECA prohibits corporations like the CPD from making such expenditures.  *Id.* § 30118(a).  The CPD's spending on a forum for Democratic and Republican presidential candidates to influence voters was an illegal corporate campaign expenditure.

88.    *Third*, the CPD violated FECA by accepting campaign contributions from its corporate sponsors.  FECA prohibits corporations from making contributions to political committees.  *Id.*  A political committee includes any group that has as its "major purpose" the election of a candidate, *Fed. Election Comm'n v. Mass. Citizens for Life*, 479 U.S. 238, 252 n.6 (1986), and that "makes expenditures aggregating in excess of $1,000 during a calendar year," 52 U.S.C. § 30101(4)(A).  The CPD qualifies as a political committee: its major (and indeed, primary) purpose is to promote the election of the Democratic or Republican nominee for president by hosting debates that showcase those candidates and exclude all others, and it devotes virtually all, if not all, of its multimillion dollar spending in service of that purpose.  The CPD's acceptance of corporate "donations" was an illegal receipt of corporate campaign contributions.  *See id.* § 30116(f).

89.    *Fourth*, the CPD violated FECA by failing to disclose its contributors and expenditures.  FECA requires a political committee to file a Statement of Organization with the FEC and to file reports detailing contributions received and expenditures made.  *See id.* §§ 30103, 30104.  Although the CPD is a political committee, it ignored these requirements.  The CPD's decision to keep its contributors and expenditures secret violated FECA.

90.     On September 17, 2014, the FEC acknowledged receipt of the administrative complaint and numbered the matter MUR 6869.

91.     Upon information and belief, the CPD and the 12 directors named in the administrative complaint responded to it on or about December 12, 2014.

92.     It has been 284 days since the FEC received Plaintiffs' administrative complaint, yet the FEC has still not taken final action on that complaint.

## LEVEL THE PLAYING FIELD'S PETITION FOR RULEMAKING

93.     LPF also filed a petition for rulemaking on September 11, 2014 seeking a revision of the FEC rules governing debates.

94.     Based on the facts and evidence documented in the petition for rulemaking and exhibits appended thereto, LPF's petition demonstrated that use of the polling criterion to determine debate admission discriminates against independent candidates, because as a practical matter it is impossible for them to meet the requirement.

95.     To cure this problem, the petition seeks a revision of the FEC rules governing debates to require the CPD or any other debate sponsor to use objective, unbiased criteria that do not require candidates to satisfy a polling threshold as the exclusive means of access to participating in presidential and vice presidential general election debates.

96.     The FEC published the petition for rulemaking for public comment on November 14, 2014.  The public comment period closed on December 15, 2014.

97.     During the public comment period, 1,252 individuals and entities besides LPF submitted comments on the petition.  1,251 of those commenters – 1,247 of whom were unknown to LPF – rejected the CPD's exclusionary system and requested that the FEC open up a

rulemaking to ensure a debate system that is fair to independent and third-party candidates.  The CPD was the only commenter opposing the initiation of a rulemaking.

98.     It has been 189 days since the close of the public comment period on LPF's petition for rulemaking.  The FEC has not initiated a rulemaking, rejected LPF's petition, or, taken any other official action on the petition.

## FEC'S UNLAWFUL FAILURE TO ACT

99.     Both the FEC's failure to take final action on the administrative complaint and its failure to act on the petition for rulemaking are arbitrary, capricious, an abuse of discretion, and otherwise contrary to law.

100.    The FEC's failure to act is particularly egregious in light of the credibility of Plaintiffs' allegations.  Both the administrative complaint and the petition documented the factual allegations set forth above in great detail and with extensive evidentiary support.  In addition, both relied on expert studies conducted by leading pollsters and a prominent campaign strategist demonstrating the ways in which the CPD's 15% rule is not reasonably achievable for third-party and independent candidates and, in fact, is systematically biased against them.

101.    The FEC's failure to act is also egregious in light of the harm posed by the CPD's violations of FECA, which have a substantial effect on presidential elections.  First, they permit millions of illegal corporate campaign donations in a national campaign.  That violation dwarfs typical FEC complaints alleging campaign finance violations involving much smaller dollar amounts and isolated Congressional races.  Second, the CPD's violations are recurring.  The CPD has used the same illegal rule in four election cycles, and there is no indication that it will not use it in the 2016 cycle.

102.     The positive public response to LPF's petition for rulemaking, as discussed *supra* ¶ 97, confirms the importance of FEC action on this issue.

103.     Moreover, the process of acting on Plaintiffs' administrative complaint in particular should be a straightforward one.  Although the evidence behind the administrative complaint is new, analysis of the complaint requires the application of familiar legal principles and does not require the extended delay thus far incurred.

104.     Upon information and belief, the Commissioners of the FEC will resist acting on the administrative complaint and the petition for rulemaking because of their respective allegiances to the Democratic and Republican parties.  The six commissioners of the FEC are three Republicans and three Democrats.  As the Supreme Court has noted, because of this structure the FEC is "inherently *bipartisan*."  *Fed. Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37 (1981) (emphasis added).  As an "inherently bipartisan" institution, the FEC is invested in the bipartisan control of our politics in the same way that the CPD is; upon information and belief, both organizations seek to perpetuate Democratic and Republican control over the political system.  As a result of this bipartisan bias, the FEC cannot act disinterestedly in addressing Plaintiffs' administrative complaint or LPF's petition for rulemaking.

105.     To give a concrete example, the last time someone petitioned for a rulemaking to change the debate rules to address the Democratic and Republican control over the debates, the FEC waited more than *eight* years after the close of the public comment period to reject the petition.  In rejecting the petition, the FEC cited the eight-year delay of its own creation as a basis for denying the petition.

106.     But even if the FEC were not biased against third-party and independent

candidates, it would still be incapable of action because the agency has become completely

dysfunctional and no longer fulfills its statutory mandate to enforce the federal election laws.

107.     The FEC's current chairwoman has publicly lamented that the FEC "is failing to

enforce the nation's campaign finance laws" because the 6-member commission is "paralyzed"

by a 3-member block that reflexively refuses to "pursu[e] investigations into potentially

significant fund-raising and spending violations."[33]   Indeed, she recently told the New York

Times that the agency is "worse than dysfunctional" and that "there is not going to be any real

enforcement" of the campaign finance laws in the next election.[34]

108.     This paralysis had stymied the FEC's ability to prosecute complex violations of

the federal election laws.  At a time when there is more money in politics than ever before, the

FEC collected just $135,813 in penalties for complex cases in 2014, one of the lowest totals in

30 years and a nearly 80% drop from the prior year.  Overall, the FEC issued less than $600,000

in fines in 2014, less than half of the amount of fines issued in the previous year and the lowest

amount ever recorded since the current system for issuing fines began in 2001.

109.     The paralysis has even made what should be noncontroversial activities

impossible to accomplish.  The FEC marked its 40th anniversary in April 2015.  The agency

published reports of its activities and the key issues it was addressing at its 10th, 20th, and 30th

anniversaries.  The FEC had to abandon this practice for the 40th anniversary because the

---

[33] Ann M. Ravel, *How Not to Enforce Campaign Laws*, N.Y. Times (Apr. 2, 2014), http://www.nytimes.com/2014/04/03/opinion/how-not-to-enforce-campaign-laws.html?_r=0.

[34] Eric Lichtblau, *F.E.C. Can't Curb 2016 Election Abuse, Commission Chief Says*, N.Y. Times (May 2, 2015), http://www.nytimes.com/2015/05/03/us/politics/fec-cant-curb-2016-election-abuse-commission-chief-says.html.

ideological gridlock made agreement on a description of the current state of the agency impossible.[35]

110.     Moreover, the agency is currently without a general counsel or an acting general counsel, despite the statutory requirement to have a general counsel.  The general counsel is, in the first instance, responsible for action on Plaintiffs' administrative complaint, including determining whether there is reason to believe the CPD and its directors have violated FECA and the FEC's regulations, and investigating any such potential violations.  Without a general counsel and even apart from its bias in favor of the Democratic-Republican duopoly, the FEC appears unable to fulfill its statutory responsibility to act on Plaintiffs' administrative complaint in a timely manner.

111.     Upon information and belief, in light of the existing unreasonable delay, the inherent bipartisan bias of the FEC, the present dysfunction of the FEC, and the absence of a general counsel, the FEC's failure to act on Plaintiffs' administrative complaint and LPF's petition for rulemaking will continue.

112.     The CPD's violation of the debate regulations and the FEC's failure to act on Plaintiffs' administrative complaint and have caused and continue to cause injury to Plaintiffs.

113.     As explained above, LPF is the successor to AE, which obtained signatures sufficient to qualify for ballot access in 41 states and sought to nominate a nonpartisan presidential ticket in 2012.  Qualified candidates for the presidency declined to participate in AE's nomination process in 2012 because the CPD's debate rule made it impossible for them to

---

[35] Rebecca Ballhaus & Brody Mullins, *Party Politics: FEC at Loggerheads on How to Celebrate Anniversary*, Wall Street Journal (Apr. 16, 2015 8:00 p.m.), http://www.wsj.com/articles/party-politics-fec-at-loggerheads-on-how-to-celebrate-anniversary-1429228827.

secure access to the debates.  The CPD's rule thus deprived AE of the robust competition for its nonpartisan nomination that it sought to achieve in 2012.

114.    LPF intends to recruit qualified independent candidates to run on a nonpartisan presidential ticket in 2016.  If the CPD's rule remains in place, it will injure LPF's ability to field a 2016 ticket, just as it injured AE's ability to do so.

115.    As explained above, the Green Party and its predecessors have nominated candidates for the Presidency and Vice Presidency in each of the past four presidential elections, and it intends to do so again in 2016.  Ralph Nader was the presidential candidate of several state Green Party organizations in 1996, with a self-imposed campaign spending limit of $5,000.  The Association of State Green Parties (which changed its name to the Green Party of the United States in 2001) nominated Ralph Nader to be its presidential candidate again in 2000, when he received 2,833,105 votes (2.7 percent of all votes cast).  In 2004, the Green Party's presidential candidate was David Cobb, who earned ballot status in 28 states.  The Green Party presidential candidate in 2008 was former six-term Congresswoman Cynthia McKinney, who achieved a ballot line in 31 states and the District of Columbia, all of which, combined, comprised more than 70% of all votes and 68% of electoral votes.  In 2012, the Green Party presidential candidate, Jill Stein, was the second Green Party candidate to qualify for matching funds from the FEC and qualified to be on the ballots in 36 states and the District of Columbia, representing 81.6% of electoral votes.  After being denied inclusion in the 2012 presidential debates by the CPD, she received 469,501 votes (0.36% of the popular vote).  Green Party presidential candidates, including Dr. Stein in 2012, have been excluded from all general election presidential debates since the CPD adopted the selection criteria challenged in the administrative complaint. The Green Party intends to nominate a presidential candidate in 2016.

116.    As explained above, the Libertarian Party was founded in 1971 and has

nominated presidential candidates during every presidential election since its formation,

including Ed Clark in 1980, who appeared on the ballot of all 50 states and the District of

Columbia; David Bergland in 1984, who received the third greatest number of votes in the

presidential election; Ron Paul in 1988, who was on the ballot in 46 states and the District of

Columbia and received the third most votes in the presidential election; Andre Marrou in 1992,

who was on the ballot of every state and the District of Columbia; Harry Browne in 1996, who

was on the ballot of every state and the District of Columbia – the first time in United States

history a "third party" earned ballot status in all 50 states and the District of Columbia for a

second consecutive time; Harry Browne again in 2000, who headed a ticket of 1,436 Libertarian

Party candidates, including 256 candidates for the U.S. House of Representatives; Michael

Badnarik 2004, who was on the ballot in 48 states; Bob Barr in 2008, who led a ticket in an

election in which fifty Libertarians were elected or re-elected; and Gary Johnson in 2012, who

received 1,275,951 votes, in an election during which six of the Libertarian Party candidates for

office also received a total of over one million votes.  Libertarian Party presidential nominees,

including Governor Johnson in 2012, have been excluded from all general election presidential

debates since the CPD adopted the selection criteria challenged in the Complaint.  The

Libertarian Party intends to nominate a presidential candidate in 2016.

117.    The CPD's current rules will also harm LPF, the Green Party and the Libertarian

Party, as well as their 2016 nominees, by causing them to suffer a competitive political

disadvantage relative to the Republican and Democratic nominees.  The application of the CPD's

biased, non-objective criteria will deny the nominees of LPF, the Green Party, and the

Libertarian Party the opportunity to be fairly considered for inclusion in the 2016 debates and

increase the probability that they will be unfairly excluded from the 2016 debates.  The CPD's use of biased selection criteria will also cause a relative diminution of the political voices of LPF, the Green Party, and the Libertarian Party and their eventual nominees and injure their ability to influence the political process by conferring a prohibited corporate campaign contribution on the Republican and Democratic nominees.

118.    The FEC's delay in acting on Plaintiffs' complaint and LPF's petition for rulemaking makes these harms more likely to occur.  Upon information and belief, so long as the CPD is not found to be in violation of the FEC's debate regulations and those regulations permit its use of its current polling criterion, it will maintain its current rules in place.  The FEC's delay makes it less likely that a final resolution of Plaintiffs' administrative complaint or LPF's petition for rulemaking, including judicial review of the resulting final agency action, will conclude by the time of the 2016 presidential debates.  The FEC's delay therefore makes it more likely that the CPD's current biased, nonobjective rules will remain in place for the 2016 election.

119.    The FEC's delay also exacerbates existing harms.  The CPD's rules put LPF, the Green Party, and the Libertarian Party at a current competitive disadvantage vis-à-vis the Republican and Democratic parties.  The Plaintiffs' fundraising and LPF's candidate recruitment efforts are hindered by the fact that the CPD's exclusionary rules are virtually certain to exclude their eventual nominees from the debates.  The Democratic and Republican parties do not operate with those disadvantages, since they know that the biased CPD will ensure their nominees are included in the debates.  The FEC's delay therefore forces Plaintiffs to conduct their current preparations for seeking ballot access and efforts for nominating a candidate in 2016 in an illegally structured campaign environment.

120.     The CPD's FECA violations and the FEC's inaction on Plaintiffs' administrative complaint also harm Dr. Ackerman.  Dr. Ackerman has a statutory right to know which political committees are supporting which candidates, and also is entitled to information concerning individuals and entities that have chosen to support the Democratic and Republican nominees. Possession of this information would assist Dr. Ackerman, and others to whom he would communicate the information, in evaluating the various candidates for President and Vice President.  The CPD, in violation of the law, fails to disclose information on its donors and expenditures.  Dr. Ackerman's inability to obtain information that the law requires be made available will result in a substantial, concrete, and particularized injury to him and similarly situated voters.

121.     Dr. Ackerman, moreover, is committed to getting the CPD to change its rules for the 2016 election by any lawful means possible.  This would include making efforts to discourage the CPD's previous donors from contributing to the CPD unless the CPD changes the debate rules to conform to the requirements of FECA and the FEC's debate staging regulation. The CPD's failure to provide information on its donors harms Dr. Ackerman's ability to undertake these efforts.  The FEC's delay in acting on Plaintiffs' complaint postpones Dr. Ackerman's receipt of the information, which risks diminishing or preventing altogether his intended efforts to dissuade donors from continuing to support the CPD.

## FIRST CAUSE OF ACTION
## FOR DECLARATORY AND INJUNCTIVE RELIEF
(28 U.S.C. §§ 2201-2202)

122.     Plaintiffs repeat and reassert the allegations in paragraphs 1 through 121 as though fully set forth herein.

123.     The FEC has failed to act on Plaintiffs' administrative complaint to date.

124.    The FEC's failure to act on Plaintiffs' administrative complaint within 120 days of its filing was arbitrary, capricious, an abuse of discretion, and otherwise contrary to law.  *See* 52 U.S.C. § 30109(a)(8)(A); 5 U.S.C. § 706.

125.    The FEC's failure to take action on Plaintiffs' administrative complaint will continue for the foreseeable future in light of the agency's unwillingness and inability to investigate the CPD.

126.    Accordingly, requiring Plaintiffs to exhaust administrative process before the FEC would be futile.

127.    The Court should declare that the FEC's failure to act is contrary to law and, as a result of the futility of exhaustion of administrative remedies, order that Plaintiffs may bring a civil action to remedy the violations of FECA alleged in their administrative complaint.

128.    In the alternative, the Court should declare that the FEC's failure to act is contrary to law and direct the FEC, within 30 days, to find that the CPD has violated FECA as set forth in the administrative complaint, and, if the FEC fails to so act, order that Plaintiffs may bring a civil action to remedy the violations of FECA alleged in their administrative complaint.

## SECOND CAUSE OF ACTION
## FOR DECLARATORY AND INJUNCTIVE RELIEF
(28 U.S.C. §§ 2201-2202)

129.    LPF repeats and reasserts the allegations in paragraphs 1 through 121 as though fully set forth herein.

130.    The FEC has failed to act on LPF's petition for rulemaking to date.

131.    The FEC's failure to act on LPF's petition for rulemaking was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  *See* 5 U.S.C. § 706.

132.     The Court should declare that the FEC must act within 30 days to open a rulemaking to revise the regulations governing presidential debates and further declare that the FEC must complete that rulemaking by the end of 2015 so that the revised rules will be in place in time for the 2016 presidential election.

## REQUESTED RELIEF

WHEREFORE, Plaintiffs, by their undersigned counsel, respectfully request that the Court grant the following relief:

a)     Declare that the FEC's failure to act on Plaintiffs' administrative complaint was arbitrary, capricious, an abuse of discretion, and otherwise contrary to law;

b)     Declare that the FEC's failure to act on LPF's petition for rulemaking was arbitrary, capricious, an abuse of discretion, and otherwise contrary to law;

c)     Direct that the FEC find that the CPD has violated 11 C.F.R. § 110.13 by staging candidate debates in a partisan manner and without pre-established, objective criteria;

d)     Direct that the FEC find that the CPD has violated 52 U.S.C. § 30118(a) by making prohibited contributions and expenditures;

e)     Direct that the FEC find that the CPD has violated 52 U.S.C. § 30116(f) by accepting prohibited contributions;

f)     Direct that the FEC find that the CPD has violated 52 U.S.C. §§ 30103 and 30104 by failing to register as a political committee and by failing to make required reports and disclosures;

g)     Order the FEC to conform to such declaration and directives within 30 days and, if the FEC fails to so act, order that Plaintiffs may bring a civil action (1) to remedy the violations of FECA alleged in their administrative complaint and, (2) if the CPD adopts rules for

the 2016 election that violate 11 C.F.R. § 110.13, to remedy the ensuing violations of FECA as well;

h)      Order that the FEC within 30 days grant LPF's petition for rulemaking and open a rulemaking to revise its rules governing presidential debates and that the FEC conclude that rulemaking by the end of 2015;

i)      Award legal fees and costs of suit incurred by Plaintiffs; and

j)      Grant such other and further relief as this Court deems just and proper.


Dated: June 22, 2015

Respectfully submitted,


  /s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro (D.C. Bar No. 438461)
SHAPIRO ARATO LLP
500 Fifth Avenue
40th Floor
New York, New York 10110
Phone:  (212) 257-4880
Fax:  (212) 202-6417

*Attorneys for Plaintiffs*